# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ANN PHAN, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 13-650L |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

A refugee who fled war-torn Cambodia when she was twenty-two, Plaintiff Ann Phan claims that she has been disabled since May 2007 because of major depressive disorder, post-traumatic stress disorder ("PTSD"), an anxiety disorder, a pain syndrome, carpal tunnel syndrome, De Quervain's syndrome and right shoulder tendinitis.[1] She is before this Court on her Motion for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act"). She contends that the Administrative Law Judge ("ALJ") erred in failing to reopen the adverse determination on her prior applications; in failing to have a medical expert testify at the administrative hearing (and, therefore, interpreting raw data himself); and in failing to find that De Quervain's syndrome and carpal tunnel syndrome are severe impairments at Step

---

[1] In addition to these conditions, the medical record reflects a diagnosis of monoclonal gammopathy of undetermined significance; this is a blood abnormality that has no impact on functioning but poses the risk of progression to myeloma, a serious form of cancer. Tr. 324. There is also reference to chronic Hepatitis B, assessed as stable. Tr. 22. Neither are alleged as a cause or contributor to disability; they will not be further mentioned in the report and recommendation.

Two. She also contends that substantial evidence does not support the ALJ's decision to give considerable weight to the non-examining state agency opinions regarding her physical and mental residual functional capacity ("RFC") and to reject the only contrary opinion, from a social worker who saw Plaintiff twice and is not an acceptable treating source. Defendant Carolyn W. Colvin has filed a Motion for an order affirming the Commissioner's decision.

This matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Having reviewed the record, I find no legal error and that the ALJ's findings are well supported by substantial evidence; I also find that this Court is not authorized to review the Commissioner's determination regarding reopening. Accordingly, I recommend that Plaintiff's Motion for Reversal of the Disability Determination of the Commissioner of Social Security (ECF No. 7) be DENIED and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 9) be GRANTED.

## I.     **Background Facts**

Plaintiff Ann Phan was born in 1958 in Cambodia. Tr. 158, 165, 502. During her childhood, she and her family were swept up in the violence of war; her mother died in childbirth, her father was executed and two half siblings died due to the lack of medical treatment. Tr. 351, 479. She was able to attend school only through third grade. Tr. 207. She speaks and understands English with difficulty, and cannot read or write it. Tr. 202, 207.

Plaintiff escaped Cambodia with her husband when she was twenty-two. Tr. 502. Over the years since, she has lived in Rhode Island, had three children, divorced her overly controlling husband and worked full-time in factories as an assembler, an inspector/mender and a stone setter. Tr. 241, 351. In January 2007, a workplace injury caused cervical radiculitis and shoulder tendinitis, which was covered by worker's compensation. Plaintiff was treated and, in

May 2007, released to return to work.  Tr. 305.  By the end of May 2007, she had resumed

"pretty much all her regular work activities."  Tr. 304.  Soon after, however, she was fired, she

believes, as retaliation for having filed a worker's compensation claim.  Tr. 304; but see Tr. 315

(Plaintiff reports that she was "laid off" in 2007).  She collected unemployment benefits.  Tr. 46.

By the end of 2007, her treating physician, Dr. Gregory Austin, opined that "[s]he obviously

could be in alternative work with limitations of no lifting over 25 pounds."  Tr. 298, 299.

Nevertheless, she now claims she decided not to look for another job because she believed she

was in too much pain.  Tr. 46.  Instead, on September 15, 2008, without the assistance of an

attorney, she filed her first set of applications for DIB and SSI, alleging onset of disability in

May 2007.  Tr. 158, 165.  She was 49 as of the onset date; because she has not worked since, she

is insured for Social Security purposes only through the end of 2012.  Tr. 183.

### A.    First Disability Applications

Plaintiff's 2008 applications alleged disability since May 2007 as a result of bilateral

shoulder pain, neck pain, knee pain, depression, PTSD, poor memory, anxiety, nightmares and

stomach pain.  Tr. 86.  The only treating source opinion from this period is that of Dr. Austin,

who opined that she is able to work with a limitation only on lifting more than twenty-five

pounds.  Tr. 298.  Otherwise, her medical records do not reflect any seriously limiting condition.

For example, during 2009, her primary care physician at the Rhode Island Hospital primary care

clinic,[2] Dr. Lakshmi Ravindran, treated her complaints of pain with over-the-counter analgesics.

E.g., Tr. 472-73.  She was also treated for depression, but the clinic notes in November 2009

record that "[h]er depression is stable."  Tr. 320, 465-66, 468.  No other mental health treatment

was recommended.

---

[2] Throughout the period of alleged disability, Plaintiff received primary care at the Rhode Island Hospital clinic.

In October 2008, Dr. Erik P. Purins, a state agency physician, reviewed Plaintiff's medical records and concluded that she could perform light work, with limitations on lifting more than ten pounds frequently and twenty pounds occasionally, as well as on overhead reaching; his opinion refers to Dr. Austin's conclusions. Tr. 308-14. In December 2008, state agency psychologist, Dr. Louis Turchetta, performed a consultative psychological evaluation. Tr. 315. He assigned a Global Assessment of Functioning ("GAF") score of 50;[3] based on a mental status examination that notes "difficulty maintaining attention and concentration." Tr. 316-17. In January 2009, state agency psychologist, Dr. J. Stephen Clifford, prepared a mental RFC assessment; he found moderate limitations in her ability to understand, remember and carry out detailed instructions, in attention and concentration and in the ability to respond to changes in the workplace. Tr. 329-47. In reliance on Dr. Turchetta's observations, he noted that her concentration and short term memory are poor and found that she is limited to simple directions and simple repetitive tasks. Tr. 345.

On February 18, 2009, Plaintiff's first set of applications were denied initially. Tr. 86. A few months later, Dr. Ravindran observed that testing to determine the etiology of Plaintiff's complaints of muscle pain was negative; he had considered chronic fatigue syndrome, fibromyalgia or somatization of depression but made no diagnosis. Tr. 473. In light of an

---

[3] A Global Assessment of Functioning ("GAF") score of 41 to 50 indicates "serious impairment in social, occupational, or school functioning;" one between 51 and 60 indicates "moderate difficulty in social, occupational, or school functioning;" one between 61 and 70 indicates "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well;" and one between 71 and 80 indicates "no more than slight impairment in social, occupational, or school functioning." See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR"). While use of GAF scores was commonplace at the time of Plaintiff's treatment, "[i]t bears noting that a recent [2013] update of the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–5")). To clarify the use of GAF scores, the Social Security Administration ("SSA") recently released an Administrative Message (identification number AM–13066, effective date July 22, 2013) ("SSA Admin Message") that "provides guidance to all State and Federal adjudicators (including administrative law judges) on how to consider . . . GAF ratings when assessing disability claims involving mental disorders." See ECF No. 7-3 at 2-6. Despite the abandonment of GAF scores in DSM-5, the SSA Admin Message makes clear that SSA will continue to receive and consider GAF in medical evidence.

increase in the severity of her depression, he recommended psychological therapy, in addition to medication, and made arrangements for her to start treatment at Kent Mental Health Services ("Kent").  Id.  At about the same time, Dr. Michael Slavit, a state agency psychologist, reviewed the updated record, including Dr. Ravindran's new treatment notes, and concurred with Dr. Clifford's January 2009 assessment.  Tr. 347.

On October 31, 2009, Plaintiff's request for reconsideration of the adverse decision on her first set of disability applications was denied.  Tr. 91.  Although the notice from the Social Security Administration ("SSA") plainly advised that Plaintiff had the right to request a hearing if she did not agree with the decision, Tr. 91, Plaintiff did nothing.  Sixty days later, the adverse decision became final.

## B.  Second Disability Applications

Within one year of the denial of the first set of applications, this time with the assistance of an attorney, Plaintiff filed her second set of applications on February 3, 2010.  Tr. 289.  They allege the same onset date and claim similar disabling conditions: major depressive disorder, PTSD, an anxiety disorder, a pain syndrome, carpal tunnel syndrome, De Quervain's syndrome, right shoulder tendinitis and other conditions not relevant to this proceeding.  Tr. 21-22, 39.  At the same time, Plaintiff requested reopening of the prior claims.  Tr. 41, 293.

### 1.  Mental Health

Based on the referral by Dr. Ravindran, in November 2009, Plaintiff began mental health treatment at Kent.  An initial assessment resulted in diagnoses of major depression, PTSD and an anxiety disorder, as well as a GAF score of 45.[4]  Tr. 351, 357.  Kent psychologist Dr. Tamra Ringeling developed a treatment plan and conducted approximately nine counselling sessions.  In June 2010, Plaintiff was discharged at own her request to take a "treatment holiday," having

---

[4] See n.3 supra.

"accomplished tx goals . . . depression & anxiety no longer interfere c̄ daily functioning."  Tr.

420-21.  At discharge, Dr. Ringeling opined that the depression was "in remission" and opined to

a dramatically improved GAF score of 75.  Tr. 416.  After discharge by Kent, Plaintiff continued

to see her primary care physician, Dr. Ravindran, for mental health treatment.  In July 2010, Dr.

Ravindran described her mental status as stable, and in September 2010, he noted that her

depression was under reasonably good control.  Tr. 444-45, 533.

In May 2010, state agency psychiatrist, Dr. Charles Hale reviewed the evidence and

recommended a complete mental status evaluation.  Tr. 414.  In June, state agency psychologist

J. Stephen Clifford reviewed the case and noted that the references to memory loss were not

supported by memory testing and echoed the need for a psychiatric consultative examination.

Tr. 415.  In response, in July 2010, Plaintiff underwent a consultative psychological evaluation

conducted by state agency psychologist, Dr. William Unger.  Tr. 501.  He found symptoms of

depression, that Plaintiff's attention, concentration and task persistence were poor, but that she

denied hallucinations, delusions, manic symptoms or suicidal ideation.  Tr. 504.  No symptoms

of PTSD, panic disorder, or a formal anxiety disorder were reported or observed.  Tr. 504.  Dr.

Unger assigned a GAF score of 55.[5]  Tr. 505.

In August 2010, state agency psychologist Dr. MaryAnn A. Paxon reviewed the file,

including Dr. Turchetta's report from the prior application, the Kent records, Dr. Ravindran's

notes and Dr. Unger's report.  She prepared a mental RFC that concluded that Plaintiff was

moderately limited in attention and concentration and the ability to understand, remember and

carry out detailed instructions, to complete a work week without interruptions and to respond to

changes in the work setting, but otherwise not significantly limited.  Tr. 497-99.  On August 27,

---

[5] See n.3 *supra*.

2010, Plaintiff's new applications were denied initially. Tr. 99. In October 2010, state agency psychologist Dr. Michael Slavit reviewed the updated medical record and agreed with Dr. Paxson's assessment. Tr. 508. On January 4, 2011, Plaintiff's request for reconsideration of the adverse decision was denied. Tr. 103. She requested a hearing, set for February 2, 2012.

Following the administrative denial, in the spring of 2011, Dr. Ravindran's notes reflect a worsening of Plaintiff's depression. Tr. 525, 530. Several months before the hearing, after a gap of over a year, Plaintiff returned to Kent for a mental health assessment in October 2011. Instead of seeing a psychologist, she had an initial meeting with Priscilla Heslin, a licensed social worker, who diagnosed manic/depressive disorder, PTSD and an unspecified anxiety disorder, assessed a GAF score of 47 and developed a treatment plan, which included a notation that Plaintiff is "looking for a new job." Tr. 548-49, 562. Plaintiff apparently saw Ms. Heslin for treatment once, on November 1, 2011. Tr. 559. Her notes from that session state that Plaintiff was cooperative, appropriate in talk, speech, behavior and appearance, adequate in mood, though sad/depressed, and that no other symptoms (such as hallucinations or delusional beliefs) were observed. Tr. 559-60. Less than two months later, on December 28, 2011, Ms. Heslin filled out a mental RFC questionnaire form opining that Plaintiff has no useful ability to do unskilled work, in effect that she is almost completely dysfunctional. Tr. 568-69. Contrary to the record and her own treatment notes, Ms. Heslin also opined that Plaintiff had hallucinations, recurrent severe panic attacks and other symptoms. Tr. 567. Ms. Heslin is the only treating source whose opinion supports the conclusion that Plaintiff is disabled.

2. Physical Health

Plaintiff's medical record reflects complaints of pain but no aggressive treatment. To develop the record, in April 2010, state agency physician Dr. Okosun Edoro performed a

7

consultative examination to explore neck, shoulder and back pain and carpal tunnel syndrome. Tr. 410. Examination of Plaintiff's spine showed some tenderness with mild limitation of motion. Tr. 411-12. Otherwise, she exhibited negative straight leg raising, the ability to walk with a normal gait and squat without difficulty, full range of shoulder motion (despite some tenderness) and no swelling or tenderness of hand or wrist joints; Dr. Edoro found full range of motion and normal sense of touch and bilateral grip strength in both hands, noting only that Tinel's sign was positive bilaterally, showing possible nerve irritation. Tr. 411-12. In April 2010, Dr. Joseph Callaghan, a state agency reviewer, concluded that Plaintiff could stand/or walk for six hours a day and sit for six hours a day based on the absence of objective findings of carpal tunnel syndrome, the absence of surgery and limited treatment for the other complaints. Tr. 402-09. In August 2010, Plaintiff's applications were denied initially. Tr. 99. Nerve conduction studies and an EMG in October 2010 were normal, with no sign of carpal tunnel syndrome. Tr. 511. In connection with reconsideration, in December 2010, Dr. Henry Laurelli reviewed the updated record and affirmed Dr. Callaghan's April 2010 assessment. Tr. 509. No treating source opined to the contrary. In January 2011, her request for reconsideration of the adverse determination was denied. Tr. 103.

During 2011, Plaintiff continued to see her primary care providers about her complaints of generalized body aches, low back pain and left wrist and forearm pain. Tr. 527. With the persistence of these complaints, Dr. Ravindran referred Plaintiff to a rheumatologist, Dr. Candace Yuvienco, who noted that fibromyalgia and osteoarthritis contribute to her pain, though it is not clear who diagnosed those conditions. Tr. 522, 525. Dr. Yuvienco did diagnose De Quervain's tenosynovitis in the left wrist due to repetitive trauma, but noted that the pain resolved with a steroid injection; she also recommended physical therapy to address shoulder

pain, concluded that Lyrica was helping with the other pains and made an appointment for Plaintiff to return for follow-up in six months.  Tr. 521-22.

## II.    Travel of the Case

After Plaintiff's applications were denied initially on August 27, 2010, and on reconsideration on January 4, 2011, Tr. 82-85, 99-108, Plaintiff sought a hearing before an ALJ, which was held on February 2, 2012.  Tr. 37, 109.  At the hearing, Plaintiff was represented by counsel.  She testified with the assistance of an interpreter; vocational expert Paul Murgo and Plaintiff's daughter Jenda Chi also testified.  Tr. 37-77.  On February 12, 2012, the ALJ issued a decision that denied Plaintiff's applications and rejected her request to reopen her prior applications.  Tr. 16-36.  Plaintiff subsequently sought review by the Appeals Council, which denied her request on July 26, 2013, making the ALJ's decision final.  Tr. 1-6.  Plaintiff timely filed this action.  Unlike her first applications, Plaintiff's second applications were consistently pursued with the assistance of an attorney.

## III.    The ALJ's Hearing and Decision

At the hearing, Plaintiff testified that she had been fired in May 2007 and had not looked for work after that due to pain in her shoulder and hands.  Tr. 45-46.  She claimed she can only sit for twenty minutes at a time, stand for ten minutes, walk for twenty minutes, lift and carry only eight pounds (and for no more than three minutes).  Tr. 46-47.  She asserted that she has trouble using her hands (and can write only briefly) and arms for repetitive actions and overhead reaching.  Tr. 48.  She has trouble using her legs for operation of foot controls and with stooping, crouching and kneeling.  Tr. 48-49.  She has problems with memory and concentration, stress and interacting with coworkers and supervisors.  Tr. 49.  She claimed that she does virtually no house chores, does not shop, never visits friends or relatives, goes to religious events only twice

a year and has no hobbies.  Tr. 51-52.  During the day, she watches a little television and takes

four rest breaks (thirty minutes each).  Tr. 52.

The vocational expert, Paul Murgo, testified that Plaintiff's past jobs as an assembler and

fabric inspector are light and unskilled.  Tr. 63.  The ALJ asked Mr. Murgo to assume that

Plaintiff: 1) is limited to lifting and carrying no more than twenty-five pounds; 2) can stand and

walk at least six hours in an eight-hour work day and can also sit for six hours; 3) can

occasionally crawl and reach above shoulder level with her right arm; 4) would have to avoid all

exposure to hazardous machinery and heights; and 5) is limited to simple, routine, repetitive

tasks in a stable environment.  Tr. 70.  Given such limitations, Mr. Murgo opined that Plaintiff

should be able to do both her past light jobs.  Tr. 71.

In his written decision, the ALJ first found that Plaintiff met the insured requirements of

the Act through December 31, 2012.  Tr. 21.  At Step One, he found that Plaintiff had not

engaged in substantial gainful activity since May 30, 2007, the date she allegedly became

disabled.  Id.  At Step Two, he found that Plaintiff had established the severe medically

determinable impairments of major depressive disorder, PTSD, an anxiety disorder, a pain

syndrome and right shoulder tendonitis.  Tr. 21-22.  Finding no probative evidence to establish

any significant work limitations from either carpal tunnel syndrome or De Quervain's syndrome,

he declined to find that they constitute serious impairments.  Id.  He based this finding on the

absence of atrophy or specific manipulative limitations, the normal tests from October 2010, the

absence of any recommendation for surgery and the resolution of tenosynovitis in the left wrist

in 2011 after a steroid injection.  Tr. 22.  At Step Three, he found that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled a listing.  Tr. 22-24.

To develop his RFC at Step Four, the ALJ sifted carefully through the medical evidence from the date of onset. He assigned considerable weight to the opinions of state agency physician Dr. Callaghan and psychologist Dr. Paxson and made extensive findings regarding why he concluded that Plaintiff's claims regarding the severity of her symptoms lacked credibility. He also carefully examined the only opinion in the record that supports a finding of disability, that of Ms. Heslin. He decided to give it no substantial evidentiary weight because it is based on a limited treating relationship; is inconsistent with Plaintiff's positive response to treatment in 2010; is inconsistent with the other medical evidence both in terms of the symptoms described and the severity ascribed to them; and is inconsistent with Ms. Heslin's own treating notes. In addition, Ms. Heslin is not an acceptable medical source and is not qualified to made a judgment regarding competitive work.

Based on this analysis, the ALJ made the following RFC finding:

> the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant can lift and/or carry 25 pounds occasionally and 25 pounds frequently; can sit for six hours and stand/walk for six hours in an 8-hour workday; can occasionally crawl and climb ladders, ropes, and scaffolds; can occasionally reach above shoulder level with the right upper extremity; cannot work at unprotected heights or around dangerous machinery; and can perform simple, routine, competitive, repetitive tasks on a sustained basis over a normal 8-hour workday, in a stable work environment, with no more than simple decision making, and no complex or detailed tasks.

Tr. 24-30. Finding that she could perform her past work as an assembler and inspector/mender, the ALJ found Plaintiff not disabled and denied her second set of applications. Tr. 31. He also denied her request to reopen the first set, noting *inter alia* that Dr. Austin had recommended that Plaintiff return to work with a limitation only on lifting more than twenty-five pounds, that, for much of the period, she did not take psychiatric medication for depression and that, by the end of the period, her depression was stable with occasional Prozac. Tr. 25-27. With no new evidence

suggesting any reason to question these conclusions, he found no basis to reopen and revise the prior determination.  Tr. 25, 27.

**IV.**     **Issues Presented**

Plaintiff presents three arguments:

1.  The ALJ erred in failing to have a medical expert testify at the hearing, instead, interpreting raw data beyond the ken of a lay person.

2.  Substantial evidence does not support the ALJ's decision to give "considerable weight" to the non-examining state agency opinions.

3.  The ALJ erred in failing to reopen the prior applications.

**V.**     **Standard of Review**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also

must consider evidence detracting from evidence on which Commissioner relied). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).[6]

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621

---

[6] The SSA has promulgated identical sets of regulations governing eligibility for DIB and SSI. See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986). For simplicity, I cite to one set only. See id.

F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).  Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact.  Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  The Court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  Id.

## VII.  Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.  Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must articulate the weight given, providing "good reasons" for the determination.  See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(c)(2).

A treating source who is not a licensed physician or psychologist[7] is not an "acceptable medical source." 20 C.F.R. § 404.1513; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment. SSR 06-03p, 2006 WL 2263437, at *2. An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function. Id. at *2-3. In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist. Id. at *5. Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file. Id. at *4.

---

[7] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields. SSR 06-03p, 2006 WL 2263437, at *1.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (see 20 C.F.R. §§ 404.1545-1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 404.1527(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

## B. Developing the Record

Social Security proceedings are "inquisitorial rather than adversarial." Sims v. Apfel, 530 U.S. 103, 110-11 (2000); Miranda v. Sec'y of Health, Educ. & Welfare, 514 F.2d 996, 998 (1st Cir. 1975) (social security proceedings "are not strictly adversarial"). The ALJ and the Appeals Council each have the duty to investigate the facts and develop the arguments both for and against granting benefits. Sims, 530 U.S. at 110-11. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. Evangelista, 826 F.2d at 142. Courts in this Circuit have made few bones about the responsibility that the Commissioner bears for adequate development of the record. Id.; see Deblois v. Sec'y of Health & Human Servs., 686 F.2d 76, 80-81 (1st Cir. 1982); Currier v. Sec'y of Health, Educ. & Welfare, 612 F.2d 594, 598 (1st Cir. 1980).

The ALJ is required to order additional medical tests and examinations only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 404.1517; see also Conley v. Bowen,

781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling this duty to conduct a full and fair inquiry, the

ALJ is not required to order a consultative examination unless the record establishes that such an

examination is necessary to enable the ALJ to render an informed decision.  Carrillo Marin v.

Sec'y of Health & Human Servs., 758 F.2d 14, 17 (1st Cir. 1985).

        C.        **The Five-Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §

404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not

disabled.  Id. § 404.1520(b).  Second, if a claimant does not have any impairment or combination

of impairments that significantly limit physical or mental ability to do basic work activities, then

the claimant does not have a severe impairment and is not disabled.  Id. § 404.1520(c).  Third, if

a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1,

the claimant is disabled.  Id. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent

doing past relevant work, the claimant is not disabled.  Id. § 404.1520(e)-(f).  Fifth, if a

claimant's impairments (considering RFC, age, education and past work) prevent doing other

work that exists in the local or national economy, a finding of disabled is warranted.  Id. §

404.1520(g).  Significantly, the claimant bears the burden of proof at Steps One through Four,

but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F. Supp. 2d 138,

144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently

severe, the ALJ must consider the combined effect of all of the claimant's impairments and must

consider any medically severe combination of impairments throughout the disability

determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and

well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits.  Deblois, 686 F.2d at 79; see 42 U.S.C. §§ 416(i)(3), 423(a), 423(c).  If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

**VIII.  Application and Analysis**

**A.     Medical Expert**

With a dearth of competent opinion evidence to justify a finding of disability, Plaintiff argues vehemently that it was error for the ALJ not to call a medical expert.  The argument rests on four legs: first, the ALJ erred in his treatment of the GAF opinions, applying his own uneducated guess as to what they mean; second, the ALJ relied on his personal experience with De Quervain's syndrome in finding that neither carpal tunnel nor De Quervain's are severe impairments at Step Two; third, the ALJ needed a medical expert to explain an apparent year-long gap in Plaintiff's mental health treatment from July 2010 to July 2011; and fourth, the ALJ needed a medical expert because of flaws in the opinion evidence.

"Administrative law judges may also ask for and consider opinions from medical experts."  20 C.F.R. § 404.1527(e)(2)(iii).  "Use of a medical advisor in appropriate cases is a matter left to the [Commissioner's] discretion; nothing in the Act or regulations requires it." Rodriguez Pagan, 819 F.2d at 5.  While it is settled law that an ALJ cannot make medical judgments, Nguyen, 172 F.3d at 35; Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17-18 (1st Cir. 1986) (per curiam), as long as the ALJ relies on substantial evidence for his

RFC determination, the argument that he should have called a medical expert is unavailing. See Bielefeldt ex rel. Wheelock v. Astrue, No. 09 C 50302, 2011 WL 3360013, at *7 (N.D. Ill. Aug. 4, 2011) (lack of medical expert testimony not error when evidence in record supports ALJ's findings). The inquiry therefore is whether any of Plaintiff's four arguments leads to the conclusion that the ALJ lacked substantial evidence for his RFC determination.

There is no need to linger over the ALJ's treatment of the GAF evidence. Consistent with the SSA Admin Message,[8] which specifies that SSA "will continue to receive and consider GAF in medical evidence," the ALJ considered Plaintiff's various GAF scores as opinion evidence, evaluating the weight to be afforded them "consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise," in addition to whether the rater is an acceptable medical source. SSA Admin Message, ECF No. 7-3 at 2-4. This is not error, despite the rejection of the use of GAF by DSM-5. Id.

Consistent with the Admin Message, the ALJ properly gave the most weight to Plaintiff's highest GAF score, 75 ("no more than slight impairment") – it is the opinion of treating psychologist Dr. Ringeling, who concluded that Plaintiff's depression was in remission after eight months of treatment and numerous counselling sessions.[9] Tr. 416; see Tr. 351-401, 416-43. Other GAF scores – 50 ("serious impairment") and 55 ("moderate difficulty") – come from the two examining agency psychologists, both of whom opined based on a single encounter with Plaintiff. Also in compliance with the guidance in the SSA Admin Message, the ALJ afforded the least weight to the GAF opinion of Ms. Heslin, who is not an acceptable medical source and whose GAF score of 47 ("serious impairment") was based on a single intake interview. Tr. 549. The ALJ's treatment of these GAF scores is not improper cherry-picking. See Resendes v.

---

[8] See n.3 supra.

[9] Plaintiff's GAF score progressed from 45 to 60 to 75 over the course of this treatment. Tr. 357, 361, 416, 426.

Astrue, 780 F. Supp. 2d 125, 137-39 (D. Mass. 2011) (overreliance on GAF scores can occur when ALJ fails to consider record as a whole); Truax v. Barnhart, 1:05CV01913, 2006 WL 3240523, at *6 (S.D. Ind. Sept. 29, 2006) (no error at Step Two when ALJ reviews GAF scores in light of entire body of available evidence). More importantly, the ALJ did not rely on his lay expertise to translate these GAF scores into functional limitations. Rather, his RFC opinion was properly based on the expertise of the three reviewing psychologists (Drs. Paxson, Clifford and Slavit). There is no error in the ALJ's treatment of the GAF evidence and no need for a medical expert to supplement their expert interpretation.

Plaintiff's second argument, in support of his claim of error based on no medical expert to opine on wrist/hand pain, is equally flawed. The ALJ did not base his Step Two finding that neither De Quervain's syndrome nor carpal tunnel syndrome constitutes a serious impairment on his own experience with De Quervain's, despite his comment at the hearing.[10] Tr. 56. Rather, his decision is firmly anchored in the medical record: it relies on a normal October 2010 test, which revealed the absence of neuropathy consistent with carpal tunnel; the absence of any thenar atrophy or specific manipulation limitations in Dr. Edoro's consultative examination; the resolution of tenosynovitis in the left wrist in 2011 with a steroid injection; the lack of any recommendation for hand or wrist surgery; and the lack of evidence that wrist pain remained a medical issue during the rest of 2011. Tr. 22, 511, 522, 528. Based on this evidence, which is more than substantial, he properly concluded that there is no probative medical evidence to establish any significant work limitations caused by either of these impairments. Tr. 22.

There is no question that the ALJ's offhand reference to his personal medical experience with De Quervain's is unfortunate and inappropriate; the transcript reflects that he stopped himself in mid-sentence, Tr. 56, doubtless in recognition that his personal experience has no

---

[10] Specifically, the ALJ said, "I've had DeQuervain's in the past. If it's resolved, it's . . . ." Tr. 56.

place in a case over which he is presiding.  Nevertheless, his decision is plain that it is based exclusively on substantial medical evidence.  <u>Monseau v. Astrue</u>, No. 5:09CV45, 2010 WL 1286200, at *3 (N.D. Va. Mar. 29, 2010) (ALJ's comment about his own physical condition does not render him incapable of reviewing record and rendering fair judgment; as long as conclusion supported by substantial evidence, decision affirmed).  With no suggestion that the inappropriate remark reflected bias or reliance on facts outside the record, the ALJ did not commit error and did not need a medical expert to interpret the medical evidence, which adequately supports his finding of no severe impairment to the wrist or hand.

The third argument – that it was error not to call a medical expert to explain an apparent treatment gap – does not withstand scrutiny either.  The argument is based on the ALJ's question to Plaintiff's attorney during the hearing: "It looks like she . . . was out of treatment [for emotional difficulties] for a long time and then recently returned . . . like, a giant gap . . . Is that accurate?"  Tr. 56.  Based on their colloquy, it appears that neither the ALJ nor Plaintiff's attorney had had time to digest the most recently produced medical records that fill in much of the gap about which the ALJ inquired and counsel could not clarify:

> ALJ:    So what I'm telling you is, is there any evidence of treatment from July 2010, from either Kent Center or Rhode Island Hospital, until June 2011 . . .
> …
> ATTY:  I, I don't know.

Tr. 57.  Plaintiff bootstraps this question into the foundation for an argument that the ALJ should have called a medical expert to explain the apparent treatment gap.

A quick look of the complete record eliminates the one-year gap that caused the ALJ and counsel so much confusion.  It also provides an explanation for the two "gaps" that remain.  Plaintiff ended counselling at Kent in June 2010 because she had achieved all her goals ("I feel fine now").  Tr. 421-23.  She was treated for depression (with medication) by Dr. Ravindran at

Rhode Island Hospital continuously from the end of treatment at Kent in 2010 and into 2011; he recorded that the depression "is under reasonably good control." Tr. 510-37. This is not a gap in treatment but rather a hiatus from counselling because Plaintiff did not need or want it. This changed in February 2011, when Dr. Ravindran notes that "[d]epression is still not under control" and that Plaintiff needs a referral to "psych." Tr. 530. The "psych" referral did not happen until October 2011, when Plaintiff had an intake appointment at Kent. This gap, from February to October 2011, was explained at the hearing by Plaintiff's daughter who testified that "the problem with the Kent Center was she fell in a gap hole somewhere. Her referrals got lost."[11] Tr. 59.

In his decision, the ALJ appropriately relied only on Plaintiff's successful conclusion of treatment at Kent in June 2010, followed by months when she did not need counselling, as evidence that Plaintiff's claim of debilitating depression during the same period lacks credibility. Tr. 27. I see no error in the ALJ's failure to call a medical expert to opine on the meaning of these treatment gaps, where the record itself affords a clear explanation and the ALJ's reliance on the mental health gap when Plaintiff was doing well is well supported by the evidence.

Plaintiff's fourth argument – the ALJ needed a medical expert once he rejected Ms. Heslin's opinion because the balance of the opinion evidence is flawed – merges into his frontal attack on the ALJ's treatment of the opinion evidence. I address these arguments together next.

B.    Opinion Evidence

Plaintiff's critique of the ALJ's weighing of the opinion evidence begins with her dissatisfaction with the ALJ's decision to afford no substantial evidentiary weight to Ms. Heslin's opinion and then focuses on the "obvious conflict" that Plaintiff contends exists

---

[11] In testimony that makes no sense, in that there was continuous treatment at Rhode Island Hospital, the daughter also testified that, "she didn't have coverage in the gap at the Rhode Island Hospital. That's why she wasn't able to be seen." Tr. 59.

between the state agency reviewers, who opined that Plaintiff's attention and concentration impairments cause moderate limitations, Tr. 343, 497, and the examining sources, who opined that Plaintiff's attention and concentration are "poor." Tr. 504; see Tr. 316 ("difficulty maintaining attention and concentration"). She also complains of the staleness of all the opinions to which the ALJ afforded probative weight, as well as the ALJ's reliance on Dr. Callaghan's opinion, part of which the ALJ himself described as "a little bit optimistic." Tr. 70.

There is no error in the ALJ's rejection of Ms. Heslin's opinion. For starters, the ALJ did not reject it simply because she is not an acceptable treating source or based on speculation that Plaintiff is not impaired. Rather, the ALJ took Ms. Heslin's status as a non-treating source into consideration, but nevertheless assessed the weight to afford her Mental RFC Questionnaire by reference to the traditional analytical framework for treating source opinions regarding the severity of symptoms. Tr. 566. He rejected it because Ms. Heslin's opinion is starkly inconsistent with the balance of the medical record, including her own treatment notes, particularly her opinion that Plaintiff's symptoms include "hallucinations or delusions," "recurrent severe panic attacks," "persistent irrational fear" and "paranoid thinking or inappropriate suspiciousness." Compare Tr. 567 (Ms. Heslin's opinion that Plaintiff has hallucinations and recurrent severe panic attacks), with Tr. 540 (Ms. Heslin's treatment notes indicating no hallucinations, delusions, persecutory or paranoia), Tr. 356 (Kent 2009 intake indicating no hallucinations or delusions), and Tr. 504 (Plaintiff denies delusions, hallucination or manic symptoms). Inconsistent with record evidence regarding Plaintiff's activities of daily living,[12] Ms. Heslin checked boxes indicating that Plaintiff either is "unable to meet competitive standards" or has "no useful ability to function," effectively opining that she is in a state of near-

_____

[12] As the ALJ noted, during the period of alleged disability, Plaintiff lived with family members, rode in a car, had friends, went to the mall, read, exercised once a day with a video, did household chores, cooked, walked for an hour each day and looked for work, among other activities. Tr. 27

complete dysfunctionality. Tr. 568-69. Ms. Heslin formed these extreme opinions based on a treating relationship of relatively limited duration – it would appear she had seen Plaintiff only twice. Finally, Ms. Heslin lacks vocational expertise so that her conclusions about Plaintiff's inability to perform competitive work are beyond her capacity. 20 C.F.R. § 404.1527(d) (opinion of treating physician on ultimate legal issue of disability is not entitled to any special significance).

The ALJ's determination to afford "no substantial evidentiary weight" to Ms. Heslin's opinion is well supported by substantial evidence and consistent with applicable legal standards. See 20 C.F.R. § 404.1527(c) (medical opinions of treating doctors, psychiatrists or psychologists entitled to controlling weight only when medically well-supported and not inconsistent with other substantial evidence). Further, although the elimination of an opinion so out of synch with the balance of the record left Plaintiff without proof of any disabling mental condition, there is no error in the ALJ's failure to call a medical expert to plug this hole. See Fontanez v. Barnhart, No. 05-10788, 2006 WL 1155471, at *10 (D. Mass. Apr. 25, 2006) (no error in calling medical expert when ALJ relies on evidence in record).

Plaintiff next aims at the mental RFC opinion evidence from the state agency non-examining psychological reviewers, to which the ALJ gave the considerable weight. Tr. 27. She argues that there is an inconsistency between the reports of the examining evaluators (Drs. Turchetta and Unger), both of whom found Plaintiff's attention and concentration to be poor, and the RFC conclusions of the psychologists (Drs. Clifford and Paxson) who opined that Plaintiff is moderately limited in her "ability to maintain attention and concentration for extended periods." Tr. 343, 497. In leveling this criticism, Plaintiff relies on her lay interpretation of "poor" concentration and attention in the examining reports. However, the record is clear that Dr.

Clifford reviewed and accepted Dr. Unger's report in forming his opinion, while Dr. Paxson reviewed and accepted Dr. Turchetta's report in forming hers; neither Dr. Clifford nor Dr. Paxson found any inconsistency between the conclusions of the examiners that attention and concentration are "poor" and his/her own opinion that this causes "moderate" limitations. Plaintiff's argument rests on her disappointment that two qualified medical professionals came to the same conclusion – that Plaintiff's "poor" attention/concentration translates into moderate limitations. The ALJ is well justified in his reliance on the RFC opinions of Drs. Clifford and Paxson. 20 C.F.R. § 404.1527; see also SSR 96-6p, 1996 WL 374180 (July 2, 1996).

Relatedly, Plaintiff attacks the age of all of the state agency opinions. Over the pendency of Plaintiff's two applications, a total of twelve state agency opinions were procured (three involving a consultative examination). Nevertheless, Plaintiff is right that the most recent one was prepared on December 13, 2010, fourteen months before the hearing in February 2012. Plaintiff is also correct that, because of this timing, the medical experts did not review the most recent medical reports from Rhode Island Hospital and Kent. Nevertheless, this argument fails to establish error requiring remand because, after November/December 2010, when the most recent record review was performed, there is no evidence of a sustained (and material) worsening in Plaintiff's condition. Abubakar v. Astrue, No. 11-10456, 2012 WL 957623, at *11 (D. Mass. Mar. 21, 2012) (relying on Ferland v. Astrue, No. 11-123, 2011 WL 5199989, at *4 (D.N.H. Oct. 31, 2011)). Rather, the new records reflect the absence of electrodiagnostic evidence of neuropathy consistent with carpal tunnel syndrome, Dr. Ravindrin's ongoing treatment of Plaintiff's chronic pain and depression, Plaintiff's abdominal complaints of unclear etiology, the decision to refer Plaintiff back to Kent for more counselling (which she had benefited from in 2010), the successful treatment of wrist pain with a steroid injection and the recommendation to

continue routine daily exercise.[13]  Tr. 510-37, 538-65.  Unlike the record in Padilla v. Barnhart,

186 F. App'x 19, 21-23 (1st Cir. 2006) (per curiam), this new evidence does not credibly

establish the sort of change in condition after the last evaluation that would require the ALJ to

consult yet another medical expert to evaluate the new evidence.

Plaintiff's last argument focuses on the physical RFC assessment of Dr. Callaghan, who

opined that Plaintiff could occasionally lift up to fifty pounds.  Although the ALJ afforded the

balance of Dr. Callaghan's opinion "considerable weight," he noted during the hearing that Dr.

Callaghan's opinion about Plaintiff's ability to lift fifty pounds is "a little bit optimistic."  Tr. 70.

As a result, the hypothetical posed to the VE and the ultimate RFC finding both reflect the ability

to lift only twenty-five pounds occasionally.  Tr. 24, 30, 70.  In his decision, where he lays out

the evidence that he considered in forming his RFC, the ALJ states that the medical source that

constitutes the evidentiary support for this finding is Dr. Austin, who had opined that Plaintiff

could return to prior work with a limitation on lifting more than twenty-five pounds.  Tr. 24, 30;

Bubar v. Astrue, 11-CV-107, 2011 WL 6937507, at *5 (D.N.H. Dec. 5, 2011) ("an

administrative law judge may pick and choose among portions of expert opinions") (citing

Evangelista, 826 F.2d at 144); see also Smith v. Colvin, CIV.A. 2:13-00275, 2014 WL 518057,

at *3 (S.D. Ala. Feb. 10, 2014) ("ALJ may choose to accept [s]ome conclusions-or

recommended related restrictions-made within an opinion while rejecting others."); Merritt v.

Astrue, No. 11-5080, 2012 WL 6726486, at *2 (W.D. Mo. Dec. 27, 2012) (ALJ not required to

rely entirely on one opinion or choose between opinions when determining RFC).  I find no error

---

[13] In the alternative, Plaintiff contends that the ALJ "admitted" that he had made a finding of significant and sustained worsening of Plaintiff's condition based on two questions he asked Plaintiff's attorney during the hearing. First, when questioning counsel whether Plaintiff had received treatment for mental impairments during 2011, he prefaced his question with the comment that "it looks like she's worse now, in 2011." Tr. 57. At another point in the hearing, he asked counsel if Plaintiff would consider amending her onset date to June 2011. Tr. 74. These are not findings that are binding on the Commissioner, but merely are questions directed to counsel before the record was complete.

in the ALJ's reliance on Dr. Callaghan for much of his RFC, but on Dr. Austin for the limitation on lifting; the ALJ is entitled to sift the evidence and Dr. Austin's opinion constitutes substantial evidentiary support for the lifting limitation in RFC. Smith, 2014 WL 518057, at *3; Bubar, 2011 WL 6937507, at *5-6. In any event, if treated as error, it is harmless in that whether Plaintiff could raise twenty-five pounds (or only twenty pounds) frequently or only occasionally is not material to the ultimate finding she is able to perform light work, including past jobs. See Rivera v. Comm'r of Soc. Sec. Admin., No. 12–1479, 2013 WL 4736396, at *11 (D.P.R. Sept. 3, 2013) (error harmless when inconsequential to ultimate nondisability determination).

To conclude, the ALJ's weighing of the opinion evidence is well supported by substantial evidence, so that the ALJ's RFC is appropriately anchored in the record. Further, there is no error in the ALJ's exercise of his discretion not to seek further medical expertise.

### C.   Reopening and Revising Determinations on Prior Applications

When a disappointed claimant fails to appeal, the decision becomes final, the claimant loses the "right to further review" and a new application for the same period is barred by administrative *res judicata*. 20 C.F.R. § 404.987(a). Within one year of when the adverse decision becomes final, the claimant may ask for reopening "for any reason," and the Commissioner "may" grant such a request. 20 C.F.R. § 404.988(a). A request for reopening within one year does not confer the "right" to reopening; rather, the operative word in § 404.988 is "may," which makes clear that reopening based on a request made within one year is subject to the discretion of the Commissioner. Monger v. Bowen, 817 F.2d 15, 17-18 (4th Cir. 1987). If there is further delay beyond the one-year period, an applicant for reopening must establish good cause, such as new and material evidence, a clerical error or error on the face of the prior determination. 20 C.F.R. §§ 404.988(b), 989(a)(1), 989(a)(3). Nevertheless, whenever the

request to reopen is made, it is well settled that neither the Social Security Act nor the Administrative Procedure Act authorizes judicial review of a final decision of the Commissioner not to reopen a claim of benefits. Colon, 877 F.2d at 152 (citing Califano v. Sanders, 430 U.S. 99, 108 (1977)). The only exception is the "rare instance[] where the Secretary's denial of a petition to reopen is challenged on constitutional grounds." Id. (quoting Califano, 430 U.S. at 109).

Plaintiff contends that the ALJ clearly erred in that he applied the "good cause" standard in denying Plaintiff's request to reopen made within one year; as a result of this error, Plaintiff argues that the ALJ improperly imposed the requirement that she produce medical evidence not considered by the state agency physicians and psychologists. The premise for this argument is belied by the decision, which does not advert to "good cause." Rather, the ALJ simply found "no basis to reopen," relying on a careful review of the evidence from the period covered by the prior applications. Tr. 25, 27. With no new evidence, a well-supported determination of no disability, and nothing to support reopening beyond Plaintiff's unvarnished argument that reopening is justified by her lack of an attorney, her language problems and her "medical health issues," the ALJ denied the request. Tr. 41.

Whether the ALJ applied the discretion standard or the good cause standard[14] is beside the point in this Court. Without a claim of a deprivation of due process, which Plaintiff has not attempted to assert, this Court may not review the ALJ's determination. Hoover v. Colvin, No. 3:13–CV–00823, 2013 WL 6385925, at *3-4 (D. Or. Dec. 6, 2013) (due process does not require

---

[14] Plaintiff contends that the Commissioner conceded that the ALJ applied the wrong standard. I do not agree. Rather, the Commissioner argued that this Court may not review the denial of reopening, whatever standard may have been applied. See Colon, 877 F.2d at 152-53 (district court simply has no authority to reweigh evidence and substitute its judgment for that of Secretary in denying request to reopen); Hoover, 2013 WL 6385925, at *4-5 (alleged erroneous use of "good cause" test on request to reopen made within one year not sufficient to raise colorable constitutional claims).

ALJ to reopen where there was no new information presented relevant to barred claim). Because Plaintiff has no colorable claim that the ALJ violated her due process rights in denying her request for reopening, her claims based on the prior applications are outside the scope of review under 42 U.S.C. § 405(g) and should be dismissed.

## IX. <u>Conclusion</u>

I recommend that Plaintiff's Motion for Reversal of the Disability Determination of the Commissioner of Social Security (ECF No. 7) be DENIED and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 9) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. <u>See</u> Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. <u>See</u> <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
October 20, 2014